[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Columbus Bar Assn. v. Nyce,* Slip Opinion No. 2018-Ohio-9.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-9

COLUMBUS BAR ASSOCIATION *v.* NYCE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Columbus Bar Assn. v. Nyce,* Slip Opinion No. 2018-Ohio-9.]

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including failing to advise clients in writing that attorney does not maintain professional-liability insurance, failing to maintain required records documenting funds held in client trust account, and making false statements of material fact in connection with disciplinary investigation—Permanent disbarment.*

(No. 2017-1078—Submitted October 17, 2017—Decided January 3, 2018.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2016-007.

_____

**Per Curiam.**

{¶ 1} Respondent, Kinsley Frampton Nyce, of Columbus, Ohio, Attorney Registration No. 0003547, was admitted to the practice of law in Ohio in 1982.

**{¶ 2}** In a May 18, 2016 amended complaint, relator, Columbus Bar Association, alleged that Nyce had failed to notify his clients in writing that he does not maintain professional-liability insurance, had failed to maintain his clients' signed acknowledgements that they had received that notice, had not maintained required records documenting the funds held in his client trust account, had commingled personal and client funds, and had made false statements of material fact in connection with the ensuing disciplinary investigation.

**{¶ 3}** Following a two-day hearing, a panel of the Board of Professional Conduct found that Nyce had committed all but one of the alleged violations and that he had actively sought to conceal evidence of his misconduct, repeatedly given false and evasive testimony, and actively sought to subvert the disciplinary process. Given the extent of Nyce's efforts to frustrate and degrade the disciplinary system, the panel and board recommended that he be permanently disbarred. Nyce objects and argues that there is insufficient evidence to support the board's findings of fact and misconduct and, therefore, that no sanction is warranted. For the reasons that follow, we overrule Nyce's objections, adopt the board's findings of fact and misconduct, and permanently disbar Nyce from the practice of law in Ohio.

**Board Findings of Fact and Misconduct**

*Count One: Professional-Liability-Insurance Violations, Failure to Withdraw*
*from Representation, Improper Communication with Person Represented by*
*Counsel, and Engaging in Conduct Involving Dishonesty*

**{¶ 4}** Nyce represented NC Plaza, L.L.C., and Arthur Goldner & Associates, Inc. ("AGA"), in an action brought by a tenant of a commercial rental property owned by NC Plaza and managed by AGA. When Nyce's clients did not prevail, AGA retained attorney Stephen Jones to appeal the trial court's decision. Jones requested that Nyce withdraw from the case, but he did not formally do so as required by Local Rule 18.01 of the Franklin County Court of Common Pleas.

{¶ 5} Jones soon discovered that AGA carried property-liability insurance that would have covered AGA's liability for several of the tenant's claims. Nyce had not advised AGA to submit a claim, and the insurer denied AGA's later-filed claim as untimely.

{¶ 6} Jones sent Nyce a letter informing him that his failure to advise AGA to file an insurance claim could be a basis for a legal-malpractice claim and requesting information about Nyce's professional-liability insurance. When Nyce failed to respond, Jones sent two additional letters. Jones's second letter stated that he presumed Nyce had malpractice insurance because AGA reported to him that Nyce had never apprised them that he lacked insurance, as required by Prof.Cond.R. 1.4(c) (requiring a lawyer to inform the client if the lawyer does not maintain professional-liability insurance and obtain a signed acknowledgment of that notice from the client). Nyce responded to Jones's third letter by sending an e-mail to Jones and Arthur Goldner, AGA's president and chief executive officer, decrying Jones's "threats."

{¶ 7} In subsequent communications, Jones repeated his earlier admonition that Nyce should not contact Goldner directly, and he asked Nyce to let him know "as soon as possible" whether he had insurance. Nyce again responded directly to Goldner, threatening that if AGA sued him, he would no longer "stay silent" about matters that his clients had allegedly communicated to him during the underlying litigation. Nyce never told Jones whether he carried professional-liability insurance.

{¶ 8} The board found that at the time of the litigation, Goldner was AGA's principal representative and ultimate decision-maker. Goldner testified that he was the only person who had authority to hire an attorney on behalf of AGA and that Nyce never informed him that he did not carry professional-liability insurance. And Nyce's own hearing and deposition testimony confirmed that he has never personally carried malpractice insurance, he did not advise Goldner of that fact, and

he did not ask Goldner to sign a notice acknowledging that Nyce lacked malpractice insurance.

{¶ 9} The board rejected Nyce's argument that he had provided the required notice to Rick Aronhalt, AGA's on-site property manager. The board noted that Nyce was required to "apprise Goldner of [his lack of malpractice insurance], rather than rely on the off-chance that Goldner's employee, Aronhalt, might remember that during a prior representation of Aronhalt personally, Respondent had no such coverage." The board was skeptical of Nyce's evidence of two forms purportedly signed by Aronhalt by which he had supposedly provided the required notice to Aronhalt. As the board noted, the forms were undated and referred to a rule that had been superseded by Prof.Cond.R. 1.4(c) in 2007. The board was also unconvinced that Aronhalt had actually signed either form.

{¶ 10} The board found that Nyce had violated Prof.Cond.R. 1.4(c), 1.4(c)(1) (requiring a lawyer to maintain, for five years after the termination of the representation of the client, a copy of a client's signed acknowledgment that the attorney does not maintain professional-liability insurance), 1.16(c) (prohibiting a lawyer from withdrawing from representation in a proceeding without leave of court if the rules of the tribunal so require), and 4.2 (prohibiting a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law or a court order). In addition, the board found that Nyce had violated Prof.Cond R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) by deliberately ignoring and evading his successor counsel's repeated and legitimate requests that he provide information about his professional-liability insurance and cease direct contact with Goldner. It also found that Nyce's conduct was sufficiently egregious to find a violation of Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to

practice law). *See, e.g., Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21.

*Count Two: Professional-Liability-Insurance Violations and Failure to Cooperate in the Ensuing Disciplinary Investigation*

{¶ 11} In 2015, during the course of investigating Nyce's representation of AGA, relator requested and later subpoenaed Nyce's client list and copies of his client-signed acknowledgments under Prof.Cond.R. 1.4(c) dating back to January 2012. Relator also told Nyce to "direct[ly] answer" Jones's questions regarding the Prof.Cond.R. 1.4(c) notice in connection with his representation of NC Plaza and AGA.

{¶ 12} During depositions, Nyce acknowledged that he represented at least 30 clients after January 2012 and that he has never personally carried malpractice insurance. Based on this testimony, the board inferred that Nyce should have retained possession of and been able to produce completed Prof.Cond.R. 1.4(c) insurance notices for at least those 30 clients. But in June 2015, Nyce's counsel produced only the two notices that had purportedly been signed by Aronhalt. Nyce later produced ten additional notices, but none of them fully complied with Prof.Cond.R. 1.4(c).

{¶ 13} One of the clients for whom Nyce should have retained a signed insurance notice was Ellen Shaffer, who retained him in June 2012. Shaffer testified that Nyce never told her that he did not carry malpractice insurance and had never given her written notice of that fact. Had he done so, she said, it would have been significant to her: "It would have made me very uneasy about a legal professional not looking after a client's best interest."

{¶ 14} At the hearing, Nyce did not challenge Shaffer's contention that he had failed to notify her that he lacked malpractice insurance. Instead, as described by the board, Nyce responded by "embark[ing] on a rambling mix of cross-examination and diatribe emblematic of his approach to the entire hearing, in the

course of which he attempted to confuse and hoodwink Shaffer with a totally different document that he had not previously disclosed to Relator * * *, feigned acting with 'integrity' when Relator challenged his belated production, and accused the panel chair of mischaracterizing what had happened during supervised discovery."

{¶ 15} During his December 2016 deposition, Nyce testified that Shaffer had signed a Prof.Cond.R. 1.4(c) notice in relation to his representation of her husband in an earlier case. Nyce stated that he could not provide a copy of the notice because it had been lost in a flood at his office—ostensibly with his other clients' notices—but he could not recall when the flood had occurred and did not offer any corroborating evidence of a flood. He also said that she had refused to return the notice that he had provided to her in relation to her case.

{¶ 16} The panel did not find Nyce's testimony regarding providing Shaffer with notice, his testimony regarding the alleged flood, or his testimony regarding the insurance notices allegedly signed by other clients to be credible. Accordingly, it found that Nyce's conduct violated Prof.Cond.R. 1.4(c), 1.4(c)(1), 8.1(a) (prohibiting a lawyer from knowingly making a false statement of material fact in connection with a disciplinary matter), and 8.1(b) (prohibiting a lawyer from failing to disclose a material fact or knowingly failing to respond to a demand for information by a disciplinary authority during an investigation) and Gov.Bar R. V(9)(G) (requiring a lawyer to cooperate in disciplinary investigations). The panel and board also found that Nyce made misrepresentations during discovery and at the hearing and had otherwise acted deceitfully and dishonestly toward relator and the panel in violation of Prof.Cond.R. 8.4(c). Furthermore, they determined that Nyce's extreme efforts to conceal evidence with respect to this count constitute egregious misconduct adversely reflecting his fitness to practice law in violation of Prof.Cond.R. 8.4(h). *See Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, at ¶ 21.

*Count Three: Client-Trust-Account Records*

{¶ 17} Nyce maintains a client trust account at Huntington National Bank. On March 24, 2016, relator asked Nyce to provide records related to that account by April 4, 2016. Among the requested documents were (for the time period of January 1, 2012, through February 29, 2016) Nyce's client fee agreements; client ledgers—that is, a record for each client showing the date, amount, and source of all funds deposited on behalf of the client; the date, amount, payee, and purpose of all disbursements; each client's running balance; monthly account reconciliations; and (for the time period of September 1, 2015, through February 29, 2016) copies of all bank statements, deposit slips, and canceled checks for the account. And to the extent that between January 1, 2012, and February 29, 2016, Nyce "received funds or other property in which a client or third party claimed a lawful interest," relator also requested copies of the notifications Nyce sent to those persons. Although relator made repeated requests for all of these records, Nyce never produced anything close to the full set of requested documents.

{¶ 18} As the board noted, Nyce's nonresponsiveness was consistent with his behavior throughout discovery and on the first day of the hearing. Because the case had been contentious, the panel chairperson closely monitored discovery, made himself available to resolve disputes, and conducted multiple teleconferences with the parties. And after one attempt to take Nyce's deposition quickly descended into chaos, the chairperson telephonically monitored Nyce's next deposition. The board remarked that "[t]hroughout discovery and continuing into the first day of the hearing, Respondent could hardly have been less forthcoming, open, and candid in responding to discovery, particularly with respect to producing his [client-trust-account] related records."

{¶ 19} For example, in Nyce's November 28, 2016 response to relator's request for production of documents, he asserted that he had already produced the requested records and that they consisted of just "nine pages." Yet Nyce did not

mention this alleged production in his April 15, 2016 letter to relator, his May 18, 2016 motions to dismiss and quash, or his June 17, 2016 answer to the amended complaint, which added Counts Three and Four. Nyce also remained silent when relator asserted in its June 22, 2016 response to his motion to quash that it had not received the requested records.

{¶ 20} Even after relator filed a motion to compel discovery in December 2016, Nyce continued to insist that he had already produced the documents—which he asserted consisted of nine pages—rather than to simply provide relator "another" copy of the documents. Nyce did not bring a copy of the documents to his deposition or the first day of the hearing. And when the panel chairperson ordered him to give a copy to relator by the end of the day, Nyce produced just *six* pages of records and claimed that the three missing pages were redundant. The board noted that those six pages were not fully responsive to relator's original discovery request and that a seventh page later produced by Nyce at the panel chairperson's instruction did not remedy the deficiency. Nyce never produced the remaining two pages of the nine that he claimed to have already given to relator.

{¶ 21} Ultimately, the board found that Nyce had failed to produce the requested documents and that he had never maintained the records, in violation of Prof.Cond.R. 1.15(a)(1) through (5) (requiring a lawyer to hold funds belonging to a client or third party in a client trust account separate from his own property and to maintain certain records including fee agreements, client ledgers, bank statements, deposit slips, canceled checks, and monthly reconciliations of the account). The board also found that Nyce had knowingly breached his duties to disclose material information when requested and to cooperate and assist in relator's investigation in violation of Prof.Cond.R. 8.1(b) and Gov.Bar R. V(9)(G).

*Count Four: The Barbara Nyce Funds*

{¶ 22} Nyce's mother, Barbara, became a patient at Burlington Health & Rehabilitation Center, a nursing facility in Burlington, Vermont, in 2013. At the

time, she had assets in excess of $700,000, including sizable accounts in two Vermont banks on which Nyce and his brother, Roger, were listed. But by the time she was discharged from Burlington Health in early 2014, she owed the facility more than $68,000.

{¶ 23} Beginning on March 18, 2014, Barbara resided at Kindred Transitional Care and Rehabilitation-Birchwood Terrace ("Birchwood"), also in Vermont. When she died on May 25, 2015, she allegedly owed Birchwood more than $137,000. But by then, Barbara had no assets from which to pay those debts.

{¶ 24} The board found that Barbara had no liquid assets at the time of her death because Nyce and his brother had systematically withdrawn the funds from her bank accounts. On June 19, 2013, Nyce and his brother caused $584,619.23 to be transferred from Barbara's accounts and distributed in seven cashier's checks made payable to themselves. Two days later, Nyce deposited those checks into his client trust account. Over the next two weeks, Nyce transferred most of those funds out of his client trust account in three batches. He deposited $200,000 into the account of a closed probate estate for which he was the executor, deposited $200,000 into a certificate of deposit held in his name, and used $177,171.87 to pay for a condominium held in the name of Nyce's wife, both individually and as a co-trustee with their son.[1]

{¶ 25} Nyce testified that he had later moved $200,000 from the certificate of deposit "to investments" for nine "clients," at his mother's direction (though he also said that she suffered from dementia and was "brain damaged"). According to Nyce, the funds were now titled in the name of a trust for the nine clients, for which his son (a nonattorney) serves as the trustee. He refused to identify the nine individuals, but said that his mother had some connection to them. Although Nyce said that it was "hard for [him] to really know" what her connection was to these

---

[1] Nyce has provided no evidence—save for his own testimony—regarding the purported trust or its intended beneficiaries.

individuals, he described them as "desperate" and said, "My mother had them deal with me over the years." He also testified that there are three "third parties that the nine clients have to embrace" who are "mutually symbiotic," and who have a potential interest in the investments. Although he denied that the third parties were clients, he refused to identify them, stating "I can't disclose the names of the third parties, but the third parties only have a future interest if things happen at this point in time. So when we negotiated and got everybody on board, they don't have any way to do anything to harm the nine until possibly a much later date and time."

{¶ 26} None of the nine "clients" is identified in what Nyce claimed was his "complete" client-trust-account ledger for 2013. And when relator's counsel inquired about the insurance-notification forms for the nine clients, Nyce replied, "Those are with me." Nyce admitted that he had not produced those forms in response to relator's requests for all insurance-notification forms and attempted to explain why by stating:

> Because they're private clients, and I'm not doing legal services for them. I'm running their accounts and running their homes. So I did not see that they're legal clients. None of them are suing anybody or getting benefits. When I say they're clients, they start out that way because of my mother; but they don't transition. They're people that eat, have a home, stay warm, survive because of what my mother and I do. That's not a legal client. It's a client.

And when the panel chairperson asked, "If they're not legal clients, then why can't we know who they are?" Nyce replied, "They don't want to be known" and "It's not anybody in here's business."

{¶ 27} On this evidence, the board concluded that Nyce had used his client trust account and the dormant probate estate's bank account to try to launder the

money from his mother's bank accounts.[2] The board characterized his story about the nine clients as "a complete sham concocted by Respondent in a vain effort to sanitize and legitimize his improper use of his [client trust] account." The board found that it was sufficiently clear that when Nyce transferred the funds out of his client trust account, he knew that at least one third party would claim an interest in them. Thus, the board concluded that Nyce's conduct with respect to the funds transferred from his mother's accounts violated Prof.Cond.R. 1.15(a) (a lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property), 1.15(b) (permitting a lawyer to deposit the lawyer's own funds in a client trust account for the sole purpose of paying or obtaining a waiver of bank service charges on that account, but only in an amount necessary for that purpose), and 1.15(d) (requiring a lawyer to promptly notify a client or third person upon receiving funds or other property in which the client or third person has a lawful interest).[3]

### Nyce's Objections to the Board Report

{¶ 28} Nyce has filed 50 pages of rambling, almost stream-of-consciousness, objections to the board's findings of fact and recommended sanction, along with numerous exhibits. In doing so, Nyce presents facts and exhibits—which were apparently not presented at his disciplinary hearing—in an attempt to recharacterize the evidence and bolster his own credibility. For example, Nyce makes repeated unsubstantiated claims that relator engaged in prosecutorial misconduct throughout the disciplinary process by falsely accusing him of committing conduct-rule violations, falsifying documents, and conspiring with the

---

[2] The board acknowledged that there are ongoing federal proceedings in Vermont regarding the transfer of Barbara's assets and that the status of those proceedings and Nyce's liability, if any, are unclear from the record in this case.

[3] The panel unanimously dismissed an alleged violation of Prof.Cond.R. 8.4(h) with respect to this count. *See* Gov.Bar R. V(12)(G).

attorneys who allegedly filed grievances against him to advance their positions in related civil litigation.

{¶ 29} A primary focus of Nyce's objections appears to be his belief that this disciplinary proceeding should have been stayed until Vermont litigation regarding his mother's Medicaid eligibility and nursing-home bills is resolved. Nyce claims, without citing any law in support, that Vermont law prevents him from disclosing any information regarding those proceedings. He then argues that the outcome of the Vermont litigation is relevant to the charges in this case. But only the allegations in Count Four are in any way related to the Vermont litigation, and those allegations arise solely from Nyce's failure to comply with the rules governing the use of his Ohio client trust account with regard to certain funds that originated in Vermont. Thus, it does not appear that the Vermont proceedings have any bearing on the charges alleged in relator's complaint. Moreover, nothing in the Rules for the Government of the Bar requires the board to issue a stay pending the outcome of related civil litigation and no one suggests that the Vermont proceedings are criminal in nature. *See* Gov.Bar R. V(18)(C) (prohibiting proceedings in disciplinary matters arising from convictions for criminal offenses to go forward until all direct appeals in the underlying criminal proceedings have concluded).

{¶ 30} Nyce also claims that the evidence against him is insufficient to support the board's findings that he engaged in the charged misconduct because the evidence consists entirely of hearsay and he was denied the opportunity to present witnesses in violation of his constitutional right to procedural due process. These claims are without merit. Relator presented testimony from multiple witnesses and submitted numerous documents to prove much of the charged misconduct. Although Nyce refused to directly authenticate many of relator's exhibits pertaining to Count Four, in some instances—particularly with respect to the bank statements for Nyce's client trust account—his own testimony ultimately confirmed the

12

accuracy of the exhibits and helped establish his misconduct. And despite Nyce's claims to the contrary, the record demonstrates that he was not deprived of the opportunity to present witnesses in his defense but that he chose to rest his case without doing so.

**{¶ 31}** Nyce's remaining objections and his pending motions—which among other things seek to supplement the record with documents purportedly related to the Vermont litigation, to stay the disciplinary proceedings pending the outcome of the Vermont litigation, to raise additional arguments in the nature of objections, to strike relator's oral argument from the record, and to urge this court not to impose sanctions against him—are likewise without merit. Accordingly, we overrule each of Nyce's objections as well as his October 12 and 30, 2017 motions and we adopt the board's findings of fact and misconduct.

### Sanction

**{¶ 32}** When imposing sanctions for attorney misconduct, we consider several relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), any other relevant factors, and the sanctions imposed in similar cases.

**{¶ 33}** Here, the board found that just one mitigating factor is present— Nyce does not have a prior disciplinary record. *See* Gov.Bar R. V(13)(C)(1). In contrast, it found that six aggravating factors are present. Specifically, Nyce (1) acted with a dishonest and selfish motive, (2) engaged in a pattern of misconduct, (3) committed multiple offenses, (4) failed to cooperate in the disciplinary process, (5) submitted false evidence, made false statements, and used deceptive practices during the disciplinary process, and (6) refused to acknowledge the wrongful nature of his misconduct. *See* Gov.Bar R. V(13)(B)(2), (3), (4), (5), (6), and (7).

**{¶ 34}** The board also detailed Nyce's numerous failures to cooperate in the disciplinary process, setting forth a litany of his obstructive and deceptive practices. Significantly, the board stated:

From the beginning, Respondent displayed open and undisguised hostility toward the disciplinary system, the attorneys representing Relator, and the panel. It would be difficult to imagine an accused attorney demonstrating less respect for the disciplinary process or less remorse for his misconduct. Throughout the proceedings, from the initial complaint through the end of the hearing, Respondent actively sought to conceal evidence of his misconduct, gave false and evasive testimony, and used a multitude of means in a dishonest effort to subvert, derail, and undermine the disciplinary process. In his answer to the amended complaint, for example, he denied the allegation, "Respondent is not licensed to practice law in Vermont" due to "lack of specificity." Relator's Ex. 35 at p. 2. He asserted "counterclaims" against Relator and its individual lawyers for a variety of constitutional violations and for violations of federal and state racketeering laws. Relator's Ex. 34 at 3-5. During discovery, he had subpoenas issued to take depositions of particular witnesses, often requiring the panel chair to issue special entries, then he failed to show up for the depositions, inconveniencing the witnesses, Relator's counsel, and Board staff. At his own aborted deposition in early December 2016, Respondent objected to the court reporting service employed by Relator as biased.

{¶ 35} Nyce also quibbled endlessly over trivial matters at his disciplinary hearing. For example, he spent five minutes debating whether he had said he had 30 clients, at least 30 clients, or approximately 30 clients during a certain period of time. And he was evasive when asked to identify documents that should have been

14

familiar to him, including relator's amended complaint, to which he stated, "I recognize that this is what it says on the front page. I don't know even upon looking I will be able to identify for certain, but that is what it says here." When shown an exhibit and asked whether he agreed that it was a letter addressed to him, he said, "Well, it is certainly not addressed to me in any way that is who I am, but I understand it is my last name and first name, but it is not me, but I got the letter, I received this letter."

**{¶ 36}** At Nyce's December 22, 2016 deposition, he invoked his Fifth Amendment privilege and refused to identify Roger Nyce as his brother. In February 2017, he reversed course and filed a memorandum in which he repeatedly identified Roger as his brother, but in his testimony at the hearing the following month, he took several minutes to ponder whether Roger was his brother before refusing to answer the question. Later during that hearing, Nyce routinely called Roger his brother as though he had never cast any doubt on the matter.

**{¶ 37}** In a similar fashion, Nyce invoked his Fifth Amendment privilege during his deposition and refused to answer questions related to his actions with regard to the money withdrawn from bank accounts in Vermont, but then at the hearing, he opened his case with a long discussion of those very matters. He also repeatedly refused to answer proper "yes" or "no" questions posed by relator's counsel—even when instructed to answer.

**{¶ 38}** Moreover, the board found that Nyce had provided false testimony and fabricated elaborate stories in an attempt to explain his failure to cooperate in the disciplinary investigation, including the following: (1) he claimed that a flood had destroyed most of his Prof.Cond.R. 1.4(c) insurance notices (despite never mentioning the flood in his first deposition or his motions attacking relator's complaint), (2) he claimed that he had satisfied relator's document request by turning over "nine pages" of client-trust-account records (which turned out to be just six pages that were produced for the first time at the hearing), and (3) he

claimed that there are nine unidentified "private clients" who are rightfully entitled to the funds that were withdrawn from his mother's bank accounts and passed through his client trust account. The board found these explanations to be incredible and concluded that Nyce is "dangerously unable to distinguish right from wrong."

{¶ 39} The self-governing nature of the legal profession requires each lawyer to cooperate in disciplinary proceedings—even when it is the lawyer's own conduct that is being scrutinized. "So when an attorney disregards or fails to cooperate in the disciplinary process, not only does he disserve the public and this court's mission to protect it, he also compromises the profession and himself as a member of it." *Disciplinary Counsel v. Watson*, 98 Ohio St.3d 181, 2002-Ohio-7088, 781 N.E.2d 212, ¶ 14. Thus, when a lawyer testifies falsely during the disciplinary process, attempts to impede, obstruct or protract the disciplinary process, or persistently refuses to accept responsibility for his or her misconduct—all of which Nyce has done here—he or she may no longer be worthy of the trust and confidence of the public and the courts. And in such cases, the appropriate sanction may tip from a term of indefinite suspension to permanent disbarment. *See*, *e.g.*, *Disciplinary Counsel v. Hoskins*, 150 Ohio St.3d 41, 2017-Ohio-2924, 78 N.E.3d 845 (permanently disbarring an attorney who continued to practice law while his license was suspended, falsely represented to opposing counsel during a deposition that his license had been reinstated, submitted false statements during the disciplinary process, and failed to acknowledge the wrongful nature of his conduct); *Toledo Bar Assn. v. Harvey*, 150 Ohio St.3d 74, 2017-Ohio-4022, 78 N.E.3d 875, ¶ 23 (permanently disbarring an attorney who neglected client matters, abandoned clients, and had "a history of not complying with the orders of the Supreme Court of Ohio and ignoring the requirements associated with the disciplinary process"); *Trumbull Cty. Bar Assn. v. Roland*, 147 Ohio St.3d 274, 2016-Ohio-5579, 63 N.E.3d 1200 (permanently disbarring an attorney who

engaged in fraudulent and dishonest conduct, neglected clients' legal matters, and failed to participate in the disciplinary process after filing answers largely denying the allegations against him).

{¶ 40} Based on the foregoing, the board determined that Nyce "no longer is fit to practice a profession grounded on trust, integrity, and candor" and that the only way to ensure the protection of the public is to permanently disbar him. Having reviewed the record, the board's report, the arguments presented in Nyce's objections and motions, and our precedent, we agree.

{¶ 41} Accordingly, we overrule Nyce's objections and pending motions and permanently disbar him from the practice of law in Ohio. Costs are taxed to Nyce.

Judgment accordingly.

O'CONNOR, C.J., and O'DONNELL, FISCHER, and DEWINE, JJ., concur.

KENNEDY, FRENCH, and O'NEILL, JJ., dissent, and would indefinitely suspend respondent from the practice of law.

_____

Scott & Nolder Co., L.P.A., and Steven S. Nolder; Terry K. Sherman; and Lori J. Brown, Bar Counsel, and A. Alysha Clous, Assistant Bar Counsel, for relator.

Kinsley Frampton Nyce, pro se.

_____